EXHIBIT A

| DISTRICT COURT, MESA COUNTY, COLORADO<br><br>125 North Spruce Street<br>Grand Junction, Colorado<br>(970) 257-3625 | DATE FILED: May 30, 2018 10:52 AM<br>FILING ID: D56702CAC24AE<br>CASE NUMBER: 2018CV30264 |
|---|---|
| **PLAINTIFF: DIANA L. SMITH**<br><br>**DEFENDANT: AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY** | ☐ **COURT USE ONLY** ☐ |
| Chadwick P. McGrady CO Reg. # 34719<br>Law Office of Chadwick McGrady, P.C.<br>417 Monument Road, Suite 6<br>Grand Junction, Colorado 81507<br>Email: chad@chadwickmcgrady.com<br>Telephone: (970) 644-5599<br>Attorney for Plaintiff | Case No.<br><br>Div. |

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW, the Plaintiff, **Diana L. Smith**, by and through her attorney Chadwick McGrady and hereby submits the following Complaint and Demand for a Jury Trial against her underinsured motorist insurance carrier **American National Property and Casualty Company**. Plaintiff states and alleges as follows:

## GENERAL ALLEGATIONS

1. Plaintiff, Diana L. Smith, resides in Grand Junction, Colorado.

2. Defendant is licensed to do business in Colorado.

3. Defendant is a wholly-owned subsidiary of American National Insurance Company, a Texas corporation with a principal place of business of Galveston, Texas 77550.

4. Defendant's parent company, American National Insurance Company, is a publicly-traded corporation listed on NASDQ as ANAT.

5. Defendant's fourth quarter 2017 net income totaled $344.6 million. A $284.8 million increase from Defendant's net income for fourth quarter 2016.

6. Defendant's after-tax investment earnings fourth quarter 2017 increased $56.4 million.

7. Defendant's premiums and other revenues for 2017 totaled $3.4 billion. $3.4 billion in 2017 demonstrated an increase of $183 million from 2016 premiums and other revenues.

8. Defendant's 2017 after-tax operating income increased $46.9 million or 37% from Defendant's 2016 after-tax operating income.

9. Venue is proper in this Court pursuant to C.R.C.P. Rule 98.

10. At all times relevant hereto, Defendant was subject to the following insurance industry standards and required to:

a. Proactively investigate all of its policyholder's claims and damages; and not delegate any portion of the investigation to the policyholder or anyone else including Defendant's attorney.

b. Objectively consider all evidence available to it after conducting a through investigation and decide claims based on policy language, and the applicable law.

c. Keep its policyholders advised of what coverages are available for underinsured motorist claims.

d. Assist its policyholders with their claims under the policy.

e. Be honest with its policyholders.

f. Must put at least as much effort into seeking information that supports increasing the value of a claim as opposed to seeking information that supports decreasing the value of its insured's claim.

g. Must not conduct a biased one-sided investigation.

h. Be fair to its insured at all times.

i. May not deny or under-pay a claim based solely on a guess or speculation.

j. May not encourage its claims handling personnel to pay as little as possible on underinsured motorist claims.

k. Not encourage its claims personnel to underpay claims.

l. As part of the process of handling underinsured motorist claims, not try to settle the claim with its policyholder for an unreasonably low amount.

m. Not pay its policyholders something which is less than the lowest potential value of the claim.

n. Pay any amounts they have determined are recoverable for an underinsured motorist claim as it is required by the insuring agreement.

o. Continue to evaluate and investigate all facts of an underinsured motorist claim even if a lawsuit is filed by the policyholder against Defendant.

p. Ensure that everything that happens regarding an underinsured motorist claim is documented in the claim file, including the claim notes and directions to attorney(s) Defendant retains to assist in Defendant's adjustment of a claim.

q. May not in any manner tie any claim to personnel compensation with insurer profitability based on delay or denial of claims.

r. May not use its claims department as a profit center.

s. May not insist on conditions that are not in the insurance policy before paying claims.

t. May not violate the Unfair Claim Settlement Practices Act.

11. On or about January 20, 2016 at or near 30 1/3 Road at D ½ Road in Grand Junction, Mesa County, Colorado Arthur Urbina negligently and carelessly operated a motor vehicle and caused a collision with a vehicle in which Plaintiff operated.

12. As a result of this motor vehicle collision Plaintiff suffered injuries, damages, harms, and losses.

13. As a direct and proximate result of the negligence and carelessness of Arthur Urbina, Plaintiff sustained personal injuries including, but not limited to, an ankle, neck, back, and knee injury.

14. As a direct and proximate result of the negligence and carelessness of Arthur Urbina, Mr. Urbina inflicted injuries on Plaintiff that required an ankle surgery and a knee surgery.

15. As a result of the negligence of Mr. Urbina and this collision, Plaintiff sustained a permanent ankle and knee injury.

16. As a result of the negligence of Mr. Urbina and this collision, Plaintiff incurred and will likely incur in the future medical expenses.

17. Since this collision, Plaintiff suffered lost wages and loss of earning capacity, and will likely incur more lost wages in the future.

18. Plaintiff has suffered and will in the future suffer noneconomic losses caused by the injuries caused from this collision.

19. Physical impairment damages were established by Robert Mack, MD's September 21, 2017 report. This report has been provided to Defendant on several occasions.

20. Plaintiff has undergone both an ankle surgery and a knee surgery, so Plaintiff sustained physical impairment damages a result of this motor vehicle collision.

21. American Family Insurance Group, on behalf of Mr. Urbina, offered Mr. Urbina's $100,000.00 liability policy limit on July 25, 2017.

22. American Family Insurance Group retained Robert Mack, MD to perform a records review to determine the causation of injuries Plaintiff claimed Arthur Urbina caused.

23. American Family Insurance Group offered Mr. Urbina's liability policy limit less than a week after American Family Insurance Group received a July 19, 2017 Independent Medical Records review from Robert Mack, MD.

24. Defendant has been provided Dr. Mack's July 19, 2017 records review to use in its adjustment of Plaintiff's claim.

25. Plaintiff has provided Dr. Robert Mack's July 19, 2017 report, September 21, 2017 report, and March 8, 2018 report to Defendant.

26. Defendant on February 23, 2018 conducted an interview of Dr. Mack.

27. Plaintiff provided to Defendant both an audio recording and transcript of Defendant's February 23, 2018 interview of Dr. Mack.

28. Plaintiff notices as required by C.R.C.P. Rule 26(a)(2) Dr. Mack as an expert witness.

29. Plaintiff reserves the right to supplement Dr. Mack's opinion and call additional experts.

30. Dr. Mack, among other opinions, contributed this motor vehicle collision for the medical need for Plaintiff's ankle surgery.

31. Defendant on July 26, 2017 consented to Plaintiff's $100,000.00 policy limits settlement with Mr. Urbina and American Family Insurance Group.

32. Plaintiff purchased an underinsured motorist policy from Defendant.

33. Plaintiff paid premiums, so Plaintiff could be ensured that underinsured motorist coverage was available to her when she needed it.

34. As a result of the injuries Plaintiff suffered in the January 20, 2016 motor vehicle collision, Plaintiff needs the benefits she paid Defendant to provide.

35. At all times relevant to this action, Defendant insured Plaintiff for underinsured motorist coverage benefits pursuant to policy number 05-A-899-98H-3 up to the amount of $250,000.00 per person and $500,000.00 per occurrence.

36. This collision occurred on January 20, 2016, so Plaintiff will be entitled to prejudgment interest until a jury has reached an award.

37. At all times relevant hereto, Mr. Urbina had a duty to exercise reasonable care in the operation of his motor vehicle upon the public roadways of the State of Colorado.

38. Mr. Urbina breached his duty owed to Plaintiff when he crashed into Plaintiff's vehicle.

39. Mr. Urbina's carelessness and recklessness resulted in the collision with Plaintiff.

40. As a direct and proximate result of the negligence of the underinsured, Mr. Urbina, Plaintiff has been damaged as described above.

41. Defendant, as Plaintiff's underinsured motorist carrier, is responsible for Plaintiff's damages to the extent these damages exceed Mr. Urbina's underlying liability policy limit of $100,000.00.

42. More specifically, the insuring agreement and Colorado law (C.R.S. § 10-4-609) required and continue to require that Defendant pay any damages the Plaintiff is entitled to recover that were proximately caused by the collision, in excess of Mr. Urbina's $100,000.00 policy limit, and up to the ANPAC underinsured insurance policy limit of $250,000.00.

43. Defendant has not paid the damages which Plaintiff is entitled to recover as underinsured motorist benefits pursuant to the underinsured motorist policy Plaintiff purchased from Defendant despite Plaintiff making numerous attempts for Defendant to act reasonable and follow Colorado law.

44. Plaintiff on or about April 28, 2017 provided notice via fax and U.S. Mail to Defendant that the January 20, 2016 motor vehicle collision could trigger the underinsured motorist protection Plaintiff purchased from Defendant.

45. Plaintiff in her April 28, 2017 notice to Defendant provided Defendant a medical release to obtain Plaintiff's medical records, so Defendant could investigate Plaintiff's claim.

46. Defendant provided Plaintiff a claim number of 05-A2VR268 so Defendant could begin processing Plaintiff's claim.

47. Plaintiff on or about October 23, 2017 sent Defendant a demand with over 300 pages of support for her underinsured motorist claim.

48. Plaintiff's October 23, 2017 demand was provided to Defendant before Plaintiff underwent a left knee surgery.

49. Plaintiff's October 23, 2017 demand packet included a second report (September 21, 2017) written and prepared by Robert Mack, MD following Dr. Mack's independent medical exam of Plaintiff.

50. Dr. Mack's second report stated the ankle injury from the January 20, 2016 motor vehicle collision caused Plaintiff's need for left knee surgery.

51. Dr. Mack's September 21, 2017 report also provided a permanent impairment rating for Plaintiff's ankle injury.

52. Defendant contacted Plaintiff about providing Plaintiff's worker's compensation file after Defendant received Plaintiff's October 2017 demand packet and Plaintiff notified Defendant that Plaintiff would undergo a knee surgery in November 2017.

53. Plaintiff responded to Defendant that no worker's compensation claim was opened because the need for the left knee surgery arose from injuries sustained in the January 20, 2016 motor vehicle collision as corroborated by Dr. Mack's September 21, 2017 independent medical exam report.

54. Defendant on November 14, 2017 responded that Plaintiff's underinsured motorist claim was under review and asked that Plaintiff submit pre-op and post operative records for review despite Plaintiff previously providing Defendant a medical authorization for Defendant to obtain Plaintiff's medical records.

55. Plaintiff on November 27, 2017 compiled with Defendant's November 14, 2017 request and provided Defendant with Plaintiff's pre-op and post-op medical records.

56. Plaintiff also on November 27, 2017 provided Defendant with an updated list of medical bills, lost income, and out of pocket expenses that totaled $185,183.72.

57. Defendant on November 27, 2017 assigned a new adjuster to Plaintiff's claim that caused additional delay.

58. Plaintiff on November 27, 2017 provided five years pre-crash medical records from Plaintiff's primary care physician in Denver. These pre-crash records show Plaintiff received no medical treatment for either her ankle or left knee.

59. Previously, in October 2017, Plaintiff provided Defendant with Plaintiff's Grand Junction primary care physician's records for five years before the January 20, 2016 motor vehicle collision.

60. Plaintiff provided these records without any request from Defendant because Plaintiff expected the prompt adjustment of her underinsured motorist claim and Plaintiff's knee and ankle symptoms did not pre-exist the January 20, 2016 motor vehicle crash.

61. Plaintiff's pre-crash, before January 20, 2016 motor vehicle collision, medical records show no medical treatment for either an ankle complaint or a left knee complaint.

62. Plaintiff on December 19, 2017 asked Defendant for the status of Defendant's adjustment of Plaintiff's underinsured motorist claim.

63. Defendant indicated it was on vacation so Defendant's adjustment of Plaintiff's claim would be delayed.

64. Plaintiff on January 2, 2018 sent Defendant an updated list of Plaintiff's special damages that totaled $187, 075.74 and asked for Defendant's status on the adjustment of Plaintiff's claim.

65. Defendant on or about January 9, 2018 offered to pay Plaintiff $5,000.00 of the $250,000.00 underinsured motorist coverage Plaintiff purchased from Defendant.

66. Defendant's January 8, 2018 letter requested Plaintiff provide her prior tax returns to further adjust Plaintiff's lost wages claim.

67. Defendant's January 9, 2018 letter stated that it believed $5,000.00 of the $250,000.00 would be the "...lowest amount over which reasonable minds cannot differ" for Plaintiff's claim.

68. Defendant's January 9, 2018 letter offered no explanation with its $5,000.00 offer to explain Defendant's position that $5,000.00 constituted the "...lowest amount over which reasonable minds cannot differ."

69. Defendant's January 9, 2018 letter stated Plaintiff had been "fully compensated" from the payments received from American Family Insurance Company, yet Defendant offered no explanation for its belief and adjustment that Plaintiff had been "fully compensated."

70. Defendant's January 9, 2018 letter stated Defendant misrepresented that Defendant paid Plaintiff $10,000.00 in medical benefits coverage.

71. Defendant's January 9, 2018 letter wrongly claimed a medical payments offset for underinsured motorist benefits in violation of Colorado law.

72. Defendant disagreed with Dr. Mack's September 21, 2017 report that connected Plaintiff's knee surgery to the injuries Plaintiff sustained in the January 20, 2016 motor vehicle collision.

73. Defendant offered no medical support of its own to contradict Plaintiff's claim and in support of Defendant's position that Plaintiff would be "fully compensated" after receipt of $5,000.00 from Defendant and $5,000.00 would be the "...lowest amount over which reasonable minds cannot differ."

74. Plaintiff on January 10, 2018 provided Defendant her prior tax returns.

75. Plaintiff on January 17, 2018 to re-adjust Plaintiff's claim because Defendant's January 9, 2018 letter misrepresented the policy Plaintiff purchased from Defendant and misstated Colorado law.

76. Defendant called Plaintiff's attorney and disagreed with Plaintiff's position that Defendant adjusted a medical payments offset credit when Defendant adjusted Plaintiff's underinsured motorist claim.

77. Plaintiff on January 17, 2018 provided Defendant with Colorado law in support of Plaintiff's position and a copy of Defendant's policy declaration sheet that Defendant sold to Plaintiff when Plaintiff asked Defendant to re-adjust Plaintiff's underinsured motorist claim.

78. Defendant on January 22, 2018 wrote Plaintiff and stated its January 9, 2018 letter included a numerical mistake and Defendant had not taken an offset on Plaintiff's underinsured motorist benefits for medical payments Defendant had paid to Plaintiff from an additional coverage Plaintiff purchased from Defendant.

79. Defendant's January 22, 2018 letter also stated, "[r]espectfully, **my** position remains unchanged and **I** cannot casually relate your client's left knee issue and subsequent surgery to this accident" (emphasis added) despite Dr. Mack's September 21, 2107 report and without any medical opinion to support Defendant's denial of Plaintiff's claim other than Defendant's subjective belief.

80. Defendant's refusal to pay Plaintiff underinsured motorist benefits for Plaintiff's left knee surgery was unreasonable.

81. Defendant also offered no permanent impairment damages for Plaintiff's ankle injury despite Dr. Mack's September 21, 2107 report stating Plaintiff sustained a disability rating from the ankle injury.

82. Defendant's refusal to pay underinsured motorist benefits for Plaintiff's permanent impairment was unreasonable.

83. Defendant's January 22, 2018 letter stated that Defendant would evaluate Plaintiff's lost wages claim after reviewing Plaintiff's tax returns.

84. After Defendant reviewed Plaintiff's tax return Defendant refused to pay any additional underinsured motorist benefits for Plaintiff's lost income claim.

85. Defendant's refusal to pay underinsured motorist benefits for Plaintiff's lost income claim was unreasonable.

86. Defendant on February 15, 2018 wrote that it believed Plaintiff showed a profit increase in 2016 despite Plaintiff being out of work for almost two months from her July 2016 ankle surgery.

87. Defendant believing that Plaintiff's income increased while out of work and recovering from an ankle surgery was unreasonable.

88. Defendant's February 15, 2018 letter also promised "I am going to obtain a record review to assist with addressing the causation for the left knee. Once this is obtained, we can consider our position and I'll be back in touch."

89. Defendant never provided to Plaintiff any medical record review on causation conducted on behalf of Defendant despite Defendant denying Plaintiff's underinsured motorist claim as noted above and below.

90. Defendant instead on February 22, 2018 retained the law firm of Kresl & Johnson, P.C. Denver, Colorado to assist Defendant in the adjustment of Plaintiff's underinsured motorist claim.

91. Defendant's retained attorney interviewed Dr. Mack on February 23, 2018.

92. Dr. Mack stated in his February 23, 2018 interview among other things that the injuries Plaintiff sustained on January 20, 2016 aggravated Plaintiff's pre-existing knee condition and caused Plaintiff experience symptoms in her left knee.

93. Dr. Mack stated in his February 23, 2018 interview among other things that Plaintiff overloading of her left knee to favor the right ankle "…definitely would be a factor in her developing symptoms in the knee"

94. But for the January 20, 2016 motor vehicle collision Plaintiff would not have injured her right ankle that caused her to favor her left knee.

95. Although Defendant knew that Dr. Mack's interview was being audio recorded, Defendant asked for Dr. Mack to sign an affidavit for "efficiency" even though neither Dr. Mack or Plaintiff had any idea the affidavit Defendant wanted Dr. Mack to sign.

96. Dr. Mack in his February 23, 2018 interview asked to review Plaintiff's November 2017 surgical records to support or contradict his earlier opinions.

97. Defendant knew from its February 23, 2018 interview of Dr. Mack that Dr. Mack would be provided Plaintiff's November 2017 surgical records and Dr. Mack could supplement his prior opinions because Plaintiff indicated these records would be provided.

98. Defendant through its attorney on February 27, 2018 stated that Defendant "…decided to stand with its offer to resolve this matter and not to participate in alternative dispute resolution…" and Defendant no longer relied on the Kresl & Johns, P.C. for its adjustment of Plaintiff's underinsured motorist claim.

99. Defendant knew that Dr. Mack would offer an additional opinion after reviewing Plaintiff's November 2017 surgical records, but Defendant denied Plaintiff's claim, nonetheless.

100. Defendant, on February 27, 2018, stated that its "undisputed payment of $5,000.00" from the $250,000.00 underinsured motorist policy Plaintiff purchased was all Defendant would pay.

101. Defendant's denial on February 27, 2018 was unreasonable.

102. Defendant was provided on April 25, 2018 Dr. Mack's March 8, 2018 report after Dr. Mack reviewed Plaintiff's November 2017 surgical records and Plaintiff's five years before the January 20, 2018 motor vehicle crash medical records.

103. Dr. Mack's March 8, 2018 report reaffirmed: "It remains my opinion that Ms. Smith aggravated preexisting degenerative arthritis of the left knee when favoring her right ankle that was injured in the motor vehicle accident of January 20, 2016."

104. Defendant's re-retained the law firm of Kresl & Johnson, P.C. to respond to Plaintiff's request that Defendant adjust Plaintiff's underinsured motorist claim after Defendant reviewed and evaluated Dr. Mack's March 8, 2018 report.

105. Defendant's law firm on May 10, 2018 took the position presumably on behalf of Defendant that Dr. Mack's report did not contribute the motor vehicle injuries as either the cause of or aggravation to Plaintiff's left knee.

106. Defendant's law firm on May 10, 2018 took the position presumably on behalf of Defendant that the medical charges for Plaintiff's past medical treatment were unreasonably expensive and thus, not recoverable from the underinsured motorist policy Plaintiff purchased from defendant.

107. Defendant's law firm on May 10, 2018 took the position presumably on behalf of Defendant that Plaintiff had been adequately compensated.

108. Defendant's law firm on May 10, 2018 took the position presumably on behalf of Defendant that "[i]f you would like to provide further explanation or documentation, **we** would be glad to consider them." Emphasis added.

109. Defendant's May 10, 2018 denial of underinsured motorist coverage benefits to Plaintiff was unreasonable.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract—Underinsured Motorist Benefits)

110. Plaintiff incorporates all previous allegations as if more fully set forth herein.

111. Plaintiff has complied with all conditions precedent to coverage under the insurance polices issued by Defendant for which Plaintiff is insured.

112. To the extent that Plaintiff has failed to comply with any of the contractual obligations, Defendant has not been prejudiced and/or any failures to comply have been waived.

113. At all time relevant to this action, Defendant owed Plaintiff the implied duty of good faith and fair dealing under the contract of insurance.

114. Defendant has breached its contract by denying and delaying a reasonable payment of underinsured motorist benefits pursuant to the policy Plaintiff purchased from Defendant.

115. As a direct and proximate result of Defendant's breach of contract, Plaintiff incurred damages as set forth herein.

## SECOND CLAIM FOR RELIEF

### (Breach of the Duty of Good Faith and Fair Dealing)

116. Plaintiff incorporates all previous allegations as if more fully set forth herein.

117. As providers of insurance services to the public, Defendant at all times had a duty to act, with good faith and fair dealing in everything pertaining thereto, abstain from deceptive or misleading practices and keep, observe, and practice the principles of law and equity in all matters pertaining to the business of insurance.

118. Under Colorado law, every insurance contract contains an implied covenant of good faith and fair dealing and imposes on insurers a duty to act in good faith and deal fairly with their insureds.

119. Pursuant to its implied duty of good faith and fair dealing, Defendant owed to Plaintiff certain duties which it breached by:

a. Failing to give equal consideration to the interest of Plaintiffs, its insured as it gives to its own interests;

b. When investigating Plaintiff's claims, failing to diligently search for evidence which supported its insured's claims;

c. Seeking to discover only evidence that defeated its insureds' (Plaintiff's) claims;

d. Unreasonably delaying and/or denying benefits under the insurance policy without a reasonable basis for delaying and/or denying benefits, with knowledge or reckless disregard of, a lack of reasonable basis for delaying and/or denying benefits;

e. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under the insurance policy;

f. Refusing to pay claims without conducting a reasonable investigation based upon all available information;

g. Not attempting in good faith to effectuate prompt, fair, and equitable settlement of claims after its liability has become reasonably clear;

h. Compelling Plaintiff to institute litigation to recover amounts due under the insurance policy by offering substantially less than the amounts Plaintiff is entitled to recover;

i. Forcing Plaintiff into the costly and lengthy process of litigation;

j. Incentivizing adjusters to delay, deny, and underpay claims.

k. Employing a law firm to adjust Plaintiff's claim instead of utilizing fair industry guidelines for fairness to its insured.

l. Any further acts which may be discovered.

120. Defendant's aforesaid conduct was unreasonable and Defendant either knew such conduct was unreasonable or recklessly disregarded the fact that the conduct was unreasonable.

121. As a direct and proximate result of Defendant's breach of its duty of good faith and fair dealing, Plaintiff sustained damages in an amount to be proved at the time of trial.

**THIRD CLAIM FOR RELIEF**

**(Violation of C.R.S. § 10-3-1115 and C.R.S. § 10-3-1116)**

122. Plaintiff incorporates all previous allegations as if more fully set forth herein.

123. Defendant's denial and delay of Plaintiff's claim for underinsured motorist benefits was and is unreasonable.

124. Pursuant to C.R.S. § 10-3-1116(1), Plaintiff's is entitled to reasonable attorney's fees, costs, and two times the covered benefit.

125. The covered benefit is $250,000.00.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff has suffered injuries, harms, and losses as a result of Defendant's negligent and careless acts. Plaintiff respectfully ask that judgment be entered against the Defendant and in favor of Plaintiff in an amount to be determined at trial, including compensation for:

a. Non-economic losses incurred to the present time, or which will probably be incurred in the future, including, but not limited to, pain and suffering, inconvenience, emotional stress, and impairment of the quality of life.

b. Economic losses incurred to the present time, or which will probably be incurred in the future, including, but not limited to, loss of earnings or impairment of earning capacity, lost home services, and reasonable and necessary medical, hospital, and other expenses;

c. Physical Impairment;

d. Disfigurement;

e. Compensatory damages that Plaintiff is entitled for bad faith, emotional distress, and any unpaid contractual benefits;

f. Reasonable attorney fees, costs, and two times the covered benefit pursuant to C.R.S. 10-3-1116;

g. Interest for wrongful withholding pursuant to C.R.S. 5-12-102;

h. Pre-judgment and post judgment interest, costs, expert witness fees, and any other relief to which Plaintiff is entitled; and

i. For such other and further relief as this Court deems just and proper.

Plaintiff reserves the right to move to add exemplary damages pursuant to C.R.S. 13-21-102. Defendant's conduct was intentional, willful, and wanton. Defendant knew it was harming Plaintiff when it engaged in this conduct. Thus, Defendant's conduct entitles Plaintiff to exemplary damages up to three times the amount of compensatory damages.

**JURY DEMAND**

Plaintiff respectfully demands a trial by jury.

DATED this 29th day of May 2018 at Grand Junction, Colorado.

THE LAW OFFICE OF CHADWICK MCGRADY, P.C.

By: ______________________

Chadwick P. McGrady Colorado Reg. #34719
Attorney for Plaintiff Diana L. Smith

Plaintiff's Address:
454 ½ Davis Road
Grand Junction, Colorado 81504

In accordance with C.R.C.P 121, a printed copy of this document with original signature is being maintained by the filing party and will be made available for inspection by other parties of the Court upon request.